Including Cases of October Term, 1925, and January
and April Terms, 1926.

## JOHN S. BRIDGES *v.* MILLER RUBBER COMPANY.

*Bond of Sales Agent—Construction—Surety Signing in Ignorance of Facts—Duty of Disclosure.*

A bond signed by defendant as surety for plaintiff's sales agents, in connection with the making of a new contract with such agents on the expiration of a former contract, *held* not to be a mere renewal of a similar bond signed by defendant at the time of the former contract.               p. 7

That one executing a bond as surety mistakenly supposed that such bond was merely a renewal of a former bond, does not justify a reformation of the bond, the obligee therein clearly intending and understanding otherwise.               pp. 7, 8

That a surety on two bonds to a single obligee, in writing to the obligee about another matter, some months after the execution of the second bond, incidentally referred to his obligation as being in the amount of such second bond only, this according with his understanding, and that the obligee did not reply to this suggestion, did not estop the obligee from asserting the surety's liability on both bonds.               pp. 8, 9

In the case of a bond, given to secure the performance of their contract by sales agents of the obligee, and guaranteeing all accounts for goods sold by the agents for the obligee, the latter's failure to inform the surety, previous to his signing the bond, that the agents were heavily in default under a previous contract, for which default the surety was liable under another bond, and that a large debtor for goods sold was bankrupt, did not relieve the surety from liability, the obligee not having procured such surety, not having any representative present at the signing, and not knowing the true condition of the agents' affairs, and the surety having made no inquiries in regard thereto, and having signed the bond merely on the request of one of the agents, his son-in-law.               pp. 9-17

*Decided January 27th, 1926.*

Appeal from the Circuit Court of Baltimore City (Sol-
ter, J.).

Bill by John S. Bridges against the Miller Rubber Com-
pany of New York. From a decree dismissing the bill, plain-
tiff appeals. Affirmed.

The cause was argued before Bond, C. J., Pattison,
Urner, Adkins, Offutt, Digges, Parke, and Walsh, JJ.

*Randolph Barton, Jr.,* and *Forrest Bramble,* with whom
were *F. Fulton Bramble* and *Barton, Wilmer, Ambler &
Barton* on the brief, for the appellant.

*Edgar Allan Poe,* with whom were *Bartlett, Poe & Clag-
gett* on the brief, for the appellee.

Walsh, J., delivered the opinion of the Court.

The question to be determined in this appeal is whether
John S. Bridges, the appellant, is liable to the Miller Rubber
Company of New York, the appellee, to the extent of $30,-
000 on two bonds of $15,000 each, signed by him and dated
respectively January 1st, 1920, and January 1st, 1922, as
contended by the appellee, or whether, as contended by the
appellant, he is only liable to the extent of $15,000, on the
theory that the second bond was simply a renewal or contin-
uation of the first bond, and also on the theory that the second
bond was void because the appellee failed to disclose certain
facts to the appellant at the time he signed it.

The practically undisputed facts of the case are that, prior
to January 1st, 1920, G. R. Schumann, a son-in-law of the
appellant, and R. Cator Robinson, were partners trading as
the Star Sales Company, which company was engaged in the
tire business in Baltimore City and handled, among others,
the products of the appellee. The Star Sales Company
bought direct from the appellee and the payment for these
purchases was guaranteed by the appellant. In December,
1919, the appellant, under this guaranty, was compelled to

pay the appellee $5,888.24, which sum, however, was repaid to him early in 1920 from the proceeds of the sale of the business and assets of the Star Sales Company. On January 1st, 1920, G. R. Schumann and R. Cator Robinson, hereinafter called the agents, entered into a two-year contract with the appellee to handle its products exclusively in Baltimore City and in certain surrounding territory in Maryland, Virginia, West Virginia and Delaware. Under the terms of this contract the tires, tubes and other articles to be sold by the agents were sent to them on consignment, title being retained by the appellee, the agents assumed all the expenses of the agency, such as rent, clerk hire and other overhead, guaranteed the payment of all accounts within thirty days from the date the goods were sold, and were to be paid as full compensation for their services the difference between the list price of the goods and the prices at which they were actually sold. In addition the contract provided that the agents should make a full daily report to the appellee of all sales, should deposit in a designated bank in the name of the appellee all money received from such sales, or on account, and send duplicate deposit slips to the appellee, and should also, on the first day of each month, make a complete report to the appellee showing all stock on hand, all accounts receivable, and the total of accounts whose collection was considered doubtful because of the bankruptcy or insolvency of the debtors. The contract also provided that the agents should furnish a surety bond in the penalty of $15,000, conditioned upon the faithful performance of the contract and guaranteeing the payment of all accounts for goods sold by the agents. This bond, which was dated January 1st, 1920, was signed by the appellant, John S. Bridges, as surety, and after providing for the faithful performance of the contract of even date, which contract was attached to and made a part of the bond, it continued as follows:

> "It is agreed by and between the parties hereto that the liability of the surety on this bond shall not become absolute as to any account for goods sold by said Schumann & Robinson, of Baltimore, Md., under said

contract, unless said account or any part thereof shall remain unpaid for thirty (30) days after the maturity thereof (the terms of sale to be thirty days net), and said surety consents to any extensions of time of payment, or extensions of credit that may be given by said Schumann & Robinson or said The Miller Rubber Co. of N. Y., to any customer of it, and waives notice of any default on the part of said Schumann & Robinson, of Baltimore, Md., in collecting and accounting for the proceeds of any sales, and waives all notice of nonpayment of any and all customer's accounts at maturity."

Upon the expiration of the two-year period, namely, on January 1st, 1922, a new contract was entered into between the agents and the appellee for another period of two years. This contract made several changes in the territory covered, and also contained a new clause providing for the advancement of money by the appellee to the agents, and its repayment upon the demand of the former. Otherwise the two contracts were substantially the same. This contract was sent to the agents on December 17th, 1921, with the following letter:

"Gentlemen:

"We are enclosing herewith a new contract, which upon execution will become effective January 1st, 1922.

"Kindly execute the contract and have a bond signed by yourself as principal and Mr. Bridges as surety, or such surety as you may elect, and whom you know will prove acceptable to this company.

"Your immediate attention to this matter, in view of the early expiration date of your present contract, will be appreciated."

On December 27th, 1921, the agents replied to this letter as follows:

"SUBJECT—NEW CONTRACT.

"We are just in receipt of the above, but note that you have not filled same in. As we would like very much to have this instrument in as definite form as

possible before submitting it to Mr. Bridges or any
other surety, we thought it best to get in communica-
tion with you at once with reference to the term of
it. As the contract which is about to expire was drawn
for two years, we would like to make the new one for
the same period, and trust that this will be satisfactory
to your company. As we feel here that the turning
point is now past and we are about to see some real
business, we believe that a contract for this length of
time would be the most equitable one for all concerned.
"We would appreciate your advices with reference to
this question so that we may fill out the bond and con-
tract and have same executed and returned to you with-
out any undue delay."

And on January 10, 1922, they wrote as follows:
"SUBJECT—CONTRACT.

"Just as soon as Mr. Bridges returns to Baltimore,
we will have our contract duly executed and returned
to you immediately. He is now attending the automo-
bile show in New York, and is expected back within
the next few days. We are sorry of this delay, but will
endeavor to get this through to you just as soon as
possible."

Shortly afterwards this bond, the penalty of which was
$15,000, and the terms of which were practically identical
with those in the bond of January 1st, 1920, was executed
by the agents as principals and the appellant as surety, and
delivered to the appellee.

In December, 1922, R. Cator Robinson decided to with-
draw from the firm of Schumann & Robinson, and in March,
1923, after he had withdrawn, a new contract was entered
into between G. R. Schumann, the remaining partner, and
the appellee. This contract was substantially similar to the
preceding contracts heretofore mentioned, but no bond was
ever executed in connection with it, Schumann having under-
taken but failed to deposit certain collateral in lieu of a
bond.

In December, 1923, the indebtedness of the old firm of Schumann & Robinson, the agents, to the appellee, amounted to over $100,000, and during that month the appellee discovered that a great part of that indebtedness was the result of misappropriations. The appellee thereupon notified the appellant of the situation, G. R. Schumann admitted the misappropriations, and after a full statement of the appellee's losses had been submitted to the appellant, demand was made upon him for $30,000, the full penalty of both bonds. Mr. Bridges declined to pay this amount, and, when suit at law was entered against him on the bonds in the Superior Court of Baltimore City, he filed his bill of complaint in this case, alleging that the bond of January 1st, 1922, was simply a renewal of the bond of January 1st, 1920, and was so understood by the parties to it, and asking that, if the bonds as executed appeared to be separate and distinct obligations, they be reformed so as to express this actual intention of the parties. The bill further asked for a discovery of the books, papers, accounts, correspondence and other matters showing the course of dealing and state of accounts between Schumann & Robinson and the Miller Rubber Company, for the enjoining of the pending suit at law between the parties, the determination by the court of the amount, if any, which Bridges owed the Miller Rubber Company, and for other relief.

The answer of the Miller Rubber Company denied that it was the intention of the parties that the bond of January 1st, 1922, was a renewal of the bond of January 1st, 1920, but alleged that each bond was a separate obligation covering different contracts and different periods of time, stated that all matters covering its transactions with Schumann & Robinson had been offered for inspection to the attorneys for Mr. Bridges, and agreed to have the question of his indebtedness as surety determined by the equity court in which the bill was filed. Testimony was taken in open court, and after a full hearing the learned court below found that Mr. Bridges was indebted to the Miller Rubber Company in

the sum of $30,000, and from a decree so stating, and dismissing the bill of complaint, Mr. Bridges has appealed.

There is little difficulty in disposing of the appellant's contention that the bonds, properly construed, are but one contract, the second being a renewal of the first. They are distinct and separate instruments, guaranteeing distinct and separate contracts, which not only cover different periods of time, but which also differ in the precise territory which they assign the agents, and, in the second contract, there is a clause regarding the advancement of money by the appellee to the agents, which is not contained in the first contract at all. In addition to this, there is not a word in the second bond or contract which refers to their being a renewal or continuation of the first ones. Under these circumstances, there can be no doubt that, looked at in themselves, each bond is a separate obligation.

Nor do we think there was such a mutual mistake by the parties regarding the effect of these instruments as would justify a court of equity in ordering their reformation. The appellant appears to have clearly thought and understood that he was merely executing a renewal bond. He testified that his son-in-law, G. R. Schumann, so advised him, and his subsequent conduct bears out his contention in this regard. But, on the other hand, it is equally apparent from the record that the appellee intended and understood that the second bond was not a mere renewal, but was a new, separate and additional obligation. Mr. Wetzel, who was general credit manager for the appellee, and had charge of the Schumann & Robinson contracts, testified positively to this effect, and stated that the requiring of additional bonds covering each additional contract for a new period of time was the usual practice of the appellee. And the request in his letter of December 17, 1921, that the second bond be executed by "Mr. Bridges as surety, or such surety as you may elect, and whom you know will prove acceptable to this company," certainly substantiates this part of his testimony. There were several other matters mentioned in the testimony which

have some bearing one way or another on the point under
discussion, but as none of them are, in our judgment, suffi-
cient to justify a conclusion different from that just an-
nounced, we will not unduly lengthen this opinion by a
recital of them.   Being of the opinion then that there was
no mutual mistake, but only a mistake by one of the parties
about these two bonds, it follows, under all the authorities,
that there can be no reformation of the bonds on this ground
alone. *Aetna Indemnity Co. v. B. & O. R. R. Co.,* 112 Md.
389; *Coggins v. Carey,* 106 Md. 217; *Gaver v. Gaver,* 119
Md. 636; *Childs on Suretyship and Guaranty,* 117, 21 R. C.
L. 995, sec. 43; *Cohen v. Numsen,* 104 Md. 679; *Stiles v.
Willis,* 66 Md. 555; *Dulany v. Rogers,* 50 Md. 524.

The appellant, however, insists that the failure of the
appellee to advise him of its views about this second bond,
after he had intimated in a letter written on April 3rd,
1922, that he was only obligated to the extent of $15,000,
estops the appellee from now asserting that he is responsible
for $30,000.   The letter in question covers more than a
page of the printed record, and, with the exception of the
last paragraph, it is devoted entirely to soliciting the appellee
to transfer its Baltimore bank account to the Atlantic Trust
Company, and in stating the soundness and strength of this
trust company.   The reference to his own liability is found
in the last paragraph, which reads as follows:

> "It is certainly true that if I can risk fifteen thou·
> sand dollars ($15,000.00) on two individuals, without
> any security whatever that you should not hesitate deal-
> ing with a bank and trust company of the size and
> guarantee of the Atlantic Trust Company of this city."

The appellee, through Mr. Wetzel, replied to this on April
18, 1922, as follows:

> "Your letter of April 3rd. has not been neglected,
> but response thereto has been delayed by reason of the
> writer's continual absence from the office.   You will
> hear further from us within the next few days."

Later on, without further correspondence, the appellee's banking account, or part of it, was transferred to the Atlantic Trust Company, but the appellant was not advised by anyone that his liability was $30,000 instead of $15,000. We do not think this estops the appellee. The subject-matter of the appellant's letter was the transfer of a bank account, and the reference to his liability as surety for Schumann & Robinson was merely incidental, so that the explanation of Mr. Wetzel that it never occurred to him to take up the question of the appellant's entire liability is quite reasonable. In addition, this Court stated, in the case of *Biggs v. Steueler,* 93 Md. 112, that "there is no rule of law which requires a person to enter into a correspondence with another in reference to a matter in dispute between them, or which holds that silence should be regarded as an admission against the party to whom the letter is addressed." And we apprehend that this rule would apply with particular force to a case like the present, in which the matter mentioned had been fixed several months before by the execution and delivery of so solemn an instrument as a bond, and in which the mention of the matter was purely incidental.

This brings us to the appellant's final and most serious contention, which is that the appellee, by failing to disclose to the appellant the actual condition of affairs existing between it and the agents at the time the second bond was executed in January, 1922, and particularly by failing to advise the appellant about the account of one Steinsnyder, at that time a bankrupt, rendered the second bond null and void. This position was not maintained in the bill of complaint, but it is pressed now under the prayer of the bill for general relief, the appellant contending that, until the accounts, papers and other data showing the course of dealing between the appellee and the agents were exhibited to his counsel, after the filing of the bill, he did not know of the existence of the facts on which this final position is based.

The disclosures above mentioned showed that, at the expiration of the first contract period on December 31st, 1921,·

the agents owed the appellee $55,596.79, that a year later they owed something over $80,000, and that when the firm of Schumann & Robinson was dissolved in March or April, 1923, and the entire agency taken over by G. R. Schumann, the old firm owed the appellee in the neighborhood of $100,-000. It further appeared that in 1920 the net sales of the agents totalled $116,607.13, on which the agents' commissions amounted to $15,566.35, that in 1921 the sales were $126,971.43, on which the commissions were $17,194.73, and that in 1922 the sales were $103,705.58, on which tne commissions were $11,640.46. And the record further shows that one of the items making up the $55,596.79 indebtedness of December 31st, 1921, was an account for $16,300, owed by one Steinsnyder, at that time a bankrupt, on which the first and final dividend from his estate was less than three per cent.

The appellant strongly urges that it was the duty of the appellee to disclose to the appellant such of these facts as existed at the time the second bond was signed, and that it was particularly its duty to advise the appellee of the condition of the Steinsnyder account, which item alone exceeded the penalty of the first bond. He argues that an indebtedness of almost twenty-five per cent. of the gross business done by the agents in 1920 and 1921, the collection of at least $16,300 of which was apparently hopeless, and the smallness or total lack of profits made by the agents after the payment of rent, clerk hire and other expenses from the commissions earned from sales, clearly indicated the complete financial failure of the agency agreement, and he contends that the failure of the appellee to apprise him of this situation constituted bad faith and rendered the second bond executed by him null and void.

On the other hand, the appellee contends that that part of the $55,597.79 indebtedness which represented December sales, perhaps $10,000, was not due on December 31st, 1921, that according to its honest belief and the statements of the agents, substantiated by their records and accounts, the

balance which was due represented accounts for goods sold, nearly all of which appeared at that time to be collectible, and that its experience with similar agency contracts, over a period of thirteen or fourteen years, had shown that as time went on the business of the agencies expanded and increased, and the various agents were usually able to absorb the comparatively small losses resulting from bad accounts. Mr. Wetzel, the credit manager of the appellee, also testified that, though the indebtedness of Schumann & Robinson was large in comparison with the volume of business done by them, it was not a particularly large amount for the appellee, which was a large rubber manufacturer engaged in business all over the country, to carry on its books, and that it was his judgment, based on his experience, that the agents' business would increase and they would probably be able to make the agency a success if they were allowed to continue it and were given proper backing by the appellee. It also appeared from the record that the appellee had no knowledge or suspicion in December, 1921, that the agents themselves had actually collected and appropriated for their own use the money for many of the accounts carried on their books as due and owing, and it further appeared that the agents made various plausible excuses from time to time as to their failure to collect these accounts, assuring the appellee that they were collectible and would eventually be collected, and that, aside from these apparently uncollected accounts, the other details of the business were in fairly good shape, and the stock supplies and records of the agents were found to be correct. Regarding the Steinsnyder account, Mr. Wetzel said that though the appellee, through him, had been active as a creditor in having him adjudicated a bankrupt, he himself had never examined the bankruptcy schedules, and did not know just what Steinsnyder's assets and liabilities were. He further said that Steinsnyder was accused of having concealed $76,000 in cash, that, as the result of a hearing on this charge, the United States District Court had placed Steinsnyder in jail for failure to account for this money, and that

the appellee believed, from assurances received from its attorneys, that Steinsnyder would eventually pay this $76,-000, and believed further that this money would be sufficient to pay the creditors practically in full. From this he concluded that there would be very little loss to Schumann & Robinson on this particular account. Mr. Wetzel was wrong about this, because, as a matter of fact, Steinsnyder's bankruptcy schedules showed liabilities of $255,163.21, and assets, some of which were very doubtful, of only $61,154.63, so that, even if the $76,000 just mentioned had been collected, there would still have been a very substantial loss to the creditors. It also appeared from the testimony that this money never was paid, that some time after December 31st, 1921, the United States District Court sentenced Steinsnyder to a year and a day at Atlanta for his failure to pay it, and that the total dividend paid on the Steinsnyder account was only 2.14163 per cent., but there is no intimation that Wetzel's belief, though erroneous, was not an honest one.

There is also some testimony tending to show that the appellant knew about this account prior to his execution of the second bond, but he himself denies that he ever heard of it, and in the view which we take of the matter, it will not be necessary to decide whether he knew of it or not. The appellant further alleged in his testimony that he knew nothing whatever of any indebtedness of Schumann & Robinson to the appellee, and knew nothing about the business affairs of the agency, but believed that it was being conducted successfully, because his son-in-law, G. R. Schumann, so advised him. The remaining facts which it is important to consider are that the losses under each contract exceed the penalty of each bond, so that any recovery under either bond should be for the full amount; that Mr. Bridges, the appellant, has been successfully engaged in business in Baltimore for upwards of fifty years and is a man of wide business experience; and that there was no personal contact between the appellant and any one representing the appellee in regard to the signing of the second bond, and there was no

solicitation of the appellant by the appellee to sign the second bond, unless the suggestion, in the appellee's letter to the agents of December 17th, 1921, that the appellant, "or such surety as you may elect," be secured, can be regarded as a solicitation.

Under the foregoing circumstances, did the failure of the appellee to advise the appellant of the condition of the agency business of Schumann & Robinson in December, 1921, render the second bond void?

The following quotation from *Childs' Suretyship and Guaranty,* pp. 65-70, correctly states the law which we believe applicable to the present case:

"54. * * * It is the duty of the obligee to volunteer information when it is apparent to him that the surety is entering into the contract through ignorance of facts which amount to deception. Fraud may arise from concealment as well as from a false statement. However, unless asked in regard to the matter, it is not the duty of the creditor or obligee voluntarily to seek the surety, and to disclose facts which are open equally to the knowledge of each party. It is the duty of the surety to protect himself, and to ascertain the risk he is incurring, and he cannot, by his neglect, throw the burden on the creditor or obligee to inform him as to matters which he could ascertain for himself without difficulty. Were the creditor required to dwell upon the risk the surety is running by entering into such a contract, it would be well nigh impossible to find any one willing to become a surety."

In *Lake v. Thomas,* 84 Md. 608, 624, this Court said: "A creditor is not bound in the absence of inquiries from the sureties to communicate to them all the circumstances that may affect their undertaking." And it then quoted with approval the following statement of the Supreme Court in the case of *Magee v. Manhattan Life Insurance Company,* 92 U.S. 99:

"A fraudulent concealment is the suppression of something which the party is bound to disclose. To constitute fraud the intent to deceive must clearly appear. The mere

relation of principal and surety does not require the voluntary disclosure of all the material facts in all cases. The same rule as to disclosures does not apply in cases of principal and surety as in the cases of insurance on ships or lives." "To render the general allegation of concealment sufficient in a pleading, it is necessary also to aver that the creditor either procured the surety's signature, or was present when the instrument was executed, and then misrepresented or concealed essential facts which should have been disclosed; otherwise the allegation of fraud is only the pleader's deduction."

And the same statement was quoted and again approved in *Wright v. German Brewing Co.,* 103 Md. 377, 380. See also *Ham. v. Greve,* 34 Ind. 18; *Hamilton v. Watson,* 12 Cl. & F. 119; *Howe Machine Co. v. Farrington,* 82 N. Y. 121; *Southwestern Company v. Wynnegar,* 111 Miss. 412; *Booth v. Storrs,* 75 Ill. 438; *Ida County Sav. Bank v. Seidensticker* (Iowa), 92 N. W. 862; 21 R. C. L., pp. 991, 993, secs. 39, 41; 32 Cyc. 63, 64.

The application of these principles to the facts and circumstances of this case leaves no room for doubt as to the liability of the appellant on both bonds.

At the time the second bond was executed the appellee did not even come in contact with the appellant, it transacted the business with the agents in Baltimore by letter from its New York office, and it was the agents, the principals of the bond, who secured the appellant as surety. The mention of the appellant's name in the appellee's letter of December 17th, 1921, cannot be construed as soliciting him to become surety. In the first place the letter was not sent to him and there is no evidence in the record that he ever saw or heard of the letter prior to signing the bond, and, secondly, the suggestion in the letter that the bond be signed by "Mr. Bridges as surety, or such surety as you may elect," shows clearly that the appellee had no intention of soliciting any particular person as surety. All it wanted was a surety who was satisfactory, and as the appellant filled this require-

ment, and was already on the first bond, his name was quite
naturally mentioned, but the selection of the surety was left
entirely in the hands of the agents, subject, of course, to ulti-
mate approval by the appellee.  This would seem to bring
the present case within the ruling announced in *Magee v.
Manhattan Life Insurance Company, supra,* and approved
by this Court in *Lake v. Thomas, supra,* and again in *Wright
v. German Brewing Co., supra,* which was, that to render
mere concealment a sufficient defense to a suit on a bond
it must appear that "the creditor either procured the surety's
signature, or was present when the instrument was executed,
and then misrepresented or concealed essential facts which
should have been disclosed."  However, we do not think
it necessary to, nor do we invoke this rule in its strictest
sense in deciding the present case.  We merely state it, in
connection with the facts which show that the appellee did
not procure the appellant's signature and was not present
when the bond was executed.  It further appears that the
appellant did not make any inquiries of the appellee con-
cerning the second bond or the condition of the principals'
business at the time he signed it, and there is nothing in the
record to show that the appellee knew or had any reason to
suspect that the appellant did not know the financial condi-
tion of the agency.  The appellant was on the first bond, he
knew that it contained the broadest sort of provisions re-
garding collections and the extension of credits, and that
he had agreed to waive all notice of default by the agents
and of non-payment of customer's accounts.  He lived in
the city in which the principal office of the agency was
located, he was himself a man of wide and varied business
experience, one of the principals was his son-in-law, and he
had, just prior to signing the first bond, paid the appellant
over five thousand dollars for shortages of these same prin-
cipals, resulting from bad accounts, when they were operat-
ing as the Star Sales Company.  It is apparent that the
slightest inquiry made of the appellee would have required
a complete disclosure of the business condition of the agency,

just as the addition of a word or two in the second bond
would have rendered it a renewal bond. But the appellant
did nothing save sign the bond as it was presented to him
by his son-in-law, and he cannot now, in our opinion, avoid
the effects of his own carelessness or lack of diligence by
seeking to charge the appellee with the performance of a
duty which did not exist.

The appellant has laid great stress on the Steinsnyder ac-
count, and insists that the failure of the appellee to advise
the appellant about it is sufficient in itself to avoid the second
bond. This contention, like most of the others made by the
appellant, ignores the lack of any evidence that the appellee
knew or should have known that the appellant did not know
all about this account, and, in addition, the appellee ex-
plained, with some show of reason, that it did not, at the
time the second bond was signed, anticipate a substantial
loss on this account. There was undoubtedly some justifica-
tion for the appellant's belief that he was only signing a
renewal bond covering a continuation of the business con-
ducted under the first contract, and the execution of the
second contract may have given him some reason to suppose
that the first one had been satisfactorily carried out, but this
alone is not sufficient to sustain a charge of bad faith against
the appellee, and as there is no evidence in the record that
the appellee did anything to induce such a belief, except
execute the second contract, or that it knew the appellant
entertained such a belief, we are constrained to hold, on both
reason and authority, that the appellant cannot now avoid
the liability he assumed by claiming that the appellee should
have given him information which he did not ask for.

Aside from a difference in the amount involved, the facts
in the case of *Southwestern Company v. Wynnegar, supra,*
are closely analogous to those now before us. In that case a
surety gave a second bond in ignorance of the fact that the
principal was indebted to the obligee for a matter covered
by the first bond, and, in disposing of the contention that
the failure of the obligee to apprise the surety of this indebt-

edness rendered the second bond void, the court, after citing a case in which it was held that it was not the duty of the obligee to make an unsolicited disclosure of the insolvency of the principal, said:

"While the precise questions here presented may not have been the issue in the above case, the same principle is, for if, when a creditor knows of the insolvency of his principal, he is under no duty without inquiry to disclose such insolvency, though such insolvency is not known to the surety, it follows that the creditor is under no obligation without inquiry to disclose to the surety that the principal has not paid a particular indebtedness, and especially is this true when the surety is also a surety for the previous indebtedness on another contract, for the creditor has the right to presume that the surety, not having made any inquiry from him, had ascertained from his principal the state of his contract. * * * This principal had commited no criminal offense and had been guilty of no act of dishonesty, and the Southwestern Company had reason to believe that the previous indebtedness would probably be paid by him." And to the same effect, see *Pingrey on Suretyship*, sec. 106.

Under these authorities, and those heretofore cited, it is apparent that the facts in the present case render the appellant responsible on both bonds.

In some of the cases cited by the able counsel for the appellant, the sureties were relieved from liability because of the failure of the obligees to disclose certain matters affecting the risk, but in none of those cases are the facts entirely similar to those now before us, and, in the few instances where principles apparently different from those above stated are announced, we are unable to agree with them.

Finding no error, the decree appealed from will be affirmed.

*Decree affirmed, the appellant to pay the costs.*